UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| **DAYLE L. OSBORNE** | * | **CIVIL ACTION NO.  13-0415** |
| **VERSUS** | * | **JUDGE JAMES T. TRIMBLE, JR.** |
| **CAROLYN W. COLVIN, ACTING COMMISSIONER, SOCIAL SECURITY ADMINISTRATION** | * | **MAG. JUDGE KAREN L. HAYES** |

## REPORT & RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits.  The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).  For the reasons assigned below, it is recommended that the decision of the Commissioner be **REVERSED and REMANDED for further proceedings.**

## Background & Procedural History

Dayle Osborne protectively filed the instant applications for Title XVI Supplemental Security Income payments and Title II Disability Insurance Benefits on October 15 and December 10, 2010, respectively.  (Tr. 17, 183-192, 200).[1]  She alleged disability as of

---

[1] Osborne apparently filed prior applications for Title II benefits on January 26, 2009, and April 8, 2010.  *See* Tr. 68, 200.  The January 26, 2009, application ultimately was denied by an Administrative Law Judge on February 17, 2010, and not further appealed.  (Tr. 68, 200). Instead, she filed a new claim on April 8, 2010, which was denied at the state agency level on August 27, 2010.  (Tr. 68).  In lieu of a request for hearing on the denial of her April 8, application, Osborne filed the instant applications.  However, by failing to seek further review of her April 8 application, the August 27, 2010, initial determination arguably became a binding determination of her disability status through the date of that decision.  *See* 20 C.F.R. § 404.905. However, as this court intends to remand this matter for further proceedings, the ALJ will have an opportunity to consider the effect of the prior denials upon remand.

September 15, 2006, because of schizoaffective disorder; post-traumatic stress disorder ("PTSD"); status-post right ankle fracture; bulimia; and tendonitis. (Tr. 204-205). The state agency denied the claims at the initial stage of the administrative process. (Tr. 66, 78, 91-94). Thereafter, Osborne requested and received an August 18, 2011, hearing before an Administrative Law Judge ("ALJ"). (Tr. 34-65). In an October 28, 2011, written decision, however, the ALJ determined that Osborne was not disabled under the Act, finding at step five of the sequential evaluation process that she was able to make an adjustment to work that exists in substantial numbers in the national economy. (Tr. 14-25). Osborne appealed the adverse decision to the Appeals Council. On January 9, 2013, however, the Appeals Council denied Osborne's request for review; thus the ALJ's decision became the final decision of the Commissioner. (Tr. 1-3).

On February 26, 2013, Osborne sought review before this court. She alleges the following errors,

(1) despite purporting to give "great weight" to the opinion of Michelle Yetman-Katz, Ph.D., a non-examining state agency psychologist, the ALJ failed to incorporate all of her limitations into her residual functional capacity assessment, or otherwise explain why the omitted portions should be rejected;

(2) the ALJ failed to properly evaluate Osborne's subjective complaints and credibility; and

(3) the Appeals Council erred by failing to remand the matter to the ALJ for consideration of newly submitted evidence.

**Standard of Review**

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Where the Commissioner's decision is

2

supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards. *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. at 401.  Substantial evidence lies somewhere between a scintilla and a preponderance.  *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991).  A finding of no substantial evidence is proper when no credible medical findings or evidence support the ALJ's determination.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).  The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

## Determination of Disability

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability.  *See* 42 U.S.C. § 423(a)(1)(D).  The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).  Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work.  *See* 42 U.S.C. § 423(d)(2)(A).  Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the

SSA.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The steps are as follows,

(1) An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2) An individual who does not have a "severe impairment" of the requisite duration will not be found disabled.

(3) An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.

(4) If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

(5) If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.

*See Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001);  20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of performing work in the national economy and is therefore not disabled.  *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987).  When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated.  *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).  If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding is conclusive and terminates the analysis.  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**The ALJ's Findings**

I.    **Steps One, Two, and Three**

The ALJ determined at step one of the sequential evaluation process that Osborne had not engaged in substantial gainful activity during the relevant period. (Tr. 19). At step two, she found that Osborne suffers severe impairments of schizoaffective disorder, depressed type; post-traumatic stress disorder; right arm/hand tendonitis; obesity; and status post-right ankle fracture with surgical repair. *Id*. She concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process. (Tr. 20-21).

II.    **Residual Functional Capacity**

The ALJ next determined that Osborne retained the residual functional capacity ("RFC") to perform light work. (Tr. 21).[2] She can stand/walk for four hours out of an eight-hour workday, but needs to use a cane to ambulate on an as-needed basis. *Id*. She can lift/carry up to 20 pounds occasionally and 10 pounds frequently. *Id*. She cannot perform work above the shoulders. *Id*. She can frequently, but not constantly grasp, grip, and handle. *Id*. She can sit up

---

[2] Light work entails:
> . . . lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

to six hours, but while seated, she must alternate sitting and standing at will. *Id*. She cannot balance or climb. *Id*. She can understand, carry out, and remember simple (not complex or detailed) instructions; use judgment to make simple, work-related decisions; and interact with supervisors and co-workers on an occasional basis, but no interaction with the general public. *Id*.

**III.    Steps Four and Five**

The ALJ concluded at step four of the sequential evaluation process that Osborne was unable to perform her past relevant work. (Tr. 23-24). Accordingly, she proceeded to step five. At this step, the ALJ determined that, as of the alleged disability onset date, Osborne was a younger individual (43 years old), with at least a high school education, and the ability to communicate in English. *Id*. Transferability of skills was not material. *Id*. She then observed that given Osborne's vocational factors, and if she were capable of performing the full range of light work, the Medical-Vocational Guidelines would direct a finding of not disabled. 20 C.F.R. § 404.1569; Rule 202.20, Table 2, Appendix 2, Subpart P, Regulations No. 4. *Id*. However, because Osborne's residual functional capacity did not permit her to perform the full range of light work, the ALJ consulted a vocational expert ("VE") to determine whether, and to what extent her additional limitations eroded the occupational base for unskilled light work. (Tr. 24-25). In response, the VE identified the representative jobs of marker, *Dictionary of Occupational Titles* ("DOT") Code # 209.587-034, label coder, DOT Code # 920.587-014, and cafeteria attendant, DOT Code # 311.677-010 that were consistent with the ALJ's RFC and Osborne's vocational profile. (Tr. 24-25, 59-60).[3]

---

[3] The VE testified that for the marker job, there were 459,324 positions nationally and 5,570 such jobs in Louisiana. (Tr. 24, 59-60). For the label coder job, there were 76,056 jobs nationally, and 1,433 jobs in Louisiana. (Tr. 24, 59-60). Finally, for the cafeteria attendant position, there were 276,308 jobs nationally, and 2,632 in Louisiana. (Tr. 24, 59-60). This incidence of work constitutes a significant number of jobs in the "national economy." 42 U.S.C.

## Analysis

I.     **Residual Functional Capacity**

    a)     <u>Chronology of Relevant Medical Evidence</u>

The instant medical record is relatively sparse. In her brief(s), plaintiff did not raise any challenge to the sufficiency of the ALJ's physical residual functional capacity assessment. Accordingly, the court's analysis necessarily focuses upon Osborne's mental impairments and their effects.

On July 28, 2010, Osborne presented to LSU Conway Hospital with complaints of moving sensations in her abdomen that caused her to think that she was pregnant. (Tr. 266). The medical providers noted, however, that multiple pregnancy tests had been negative, and she previously had undergone a hysterectomy. *Id*.

At the request of the state agency, David Williams, Ph.D., administered a "Psychiatric" diagnostic interview examination on August 12, 2010. (Tr. 246-253). Williams noted that Osborne smiled and laughed a lot during the interview. *Id*. Osborne reported that her chief complaint was PTSD, and that she had not been able to work because of flashbacks. *Id*. She reported no episodes of decompensation over the past three years. *Id*. She stated that she had some friends who were positive influences. *Id*. She engaged in social activities occasionally. *Id*. Since 2009, she has attended the behavioral health center, twice per week. *Id*. She presented in an oversized shirt that was oversized, wrinkled, and stained. *Id*. However, her speech was logical and coherent. *Id*. Williams observed no delusions. *Id*. Her judgment was good, and her ability to attend and maintain focus remained intact. *Id*. She was able to tolerate the stress of the

---

§ 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number).

interview without any problem. *Id*. Her persistence was good. *Id*. Williams diagnosed PTSD, bulimia, and schizotypal personality disorder. *Id*. He assigned a Global Assessment of Functioning ("GAF") score of 60,[4] and noted that she had no problems on the mental status examination. *Id*. He opined that her symptoms appeared to be well-managed. *Id*. He also endorsed her credibility. *Id*.

In 2010, Osborne saw Scott Zentner, M.D., on two occasions (September 9 and 23, 2010), for treatment at the Primary Health Services Center, Behavioral Health Program. (Tr. 322). On September 10, 2010, Zentner noted that this was his first visit with Osborne since she initiated contact on October 29, 2009. (Tr. 323). He documented that Osborne did not take her prescribed medication regularly. *Id*. He also noted her bizarre abdominal complaints: Osborne though that she might be pregnant even though she had had a partial hysterectomy. *Id*.

On September 23, 2010, Dr. Zentner wrote that Osborne was becoming increasingly paranoid and anxious. (Tr. 324). She was engaging in reflexive rubbing of her skin during stressful periods. *Id*. She also continued to demonstrate nervous, inappropriate laughter and fidgeting. *Id*. Her symptoms appeared to be related to chronic marital strain. *Id*. Zentner diagnosed PTSD and schizotypal personality disorder. *Id*. He indicated that, because of the severity of her symptoms, she needed to be transferred to Monroe Mental Health. *Id*.

On September 27, 2010, Osborne underwent an initial screening/intake assessment and psychiatric evaluation at the Monroe Mental Health Clinic. (Tr. 286-289). The assessment

---

[4] "GAF is a standard measurement of an individual's overall functioning level 'with respect only to psychological, social, and occupational functioning.'" *Boyd*, 239 F.3d at 701 n2 (citing AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 32 (4th ed. 1994) (DSM-IV)). A GAF of 51-60 is defined as "**[m]oderate symptoms** (e.g. flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, no friends, unable to keep a job). DSM-IV, pg. 32.

reflects that Osborne received treatment at the Behavioral Health Department of the Primary Health Center for the past two years. *Id*. She exhibited symptoms of depression, anxiety, and paranoia. *Id*. She reported that sometimes she felt things crawling on her. *Id*. She also laughed inappropriately during the interview. *Id*.

In connection with Osborne's transfer to Monroe Mental Health, Dr. Zentner administered a psychiatric evaluation on October 15, 2010. (Tr. 290-291). Zentner noted that Osborne talked spontaneously, but that her thought processes were scattered and digressive when not held to structured interview. *Id*. Her affect was odd, with loud, nontextual laughing at times. *Id*. She had some referential thinking, but no systemized delusions. *Id*. She was hyperalert and fully oriented. *Id*. Zentner diagnosed schizoaffective disorder, depressed type, PTSD, and assigned a GAF of 40. *Id*.[5] Zentner concluded that he thought that Osborne was sufficiently disabled to a degree that future gainful employment was unlikely. *Id*. He opined that she would require long-term mental health services. *Id*.

On December 9, 2010, Osborne discussed with her therapist that she had qualified for food stamps. (Tr. 292). She explained that she also wanted to receive disability so she could have some down time without stressing about where her next meal would come from. *Id*.

On December 9, 2010, Osborne told Dr. Zentner that she liked living at Hope House. (Tr. 293). She was working on applying for disability. *Id*. She reported that the Chlorpromazine helped her, and she liked it. *Id*. She was less depressed, and more at peace. *Id*. Zentner noted,

---

[5] A GAF of 31-40 is defined as "**[s]ome impairment in reality testing or communication** (e.g. speech is at times illogical, obscure, or irrelevant) **OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood** (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, DSM-IV, pg. 32 (emphasis in original).

however, that she continued to experience suspiciousness, alternating with frequent, inappropriate laughter. *Id*.

On or about March 10, 2011, Osborne left the housing program to return to her husband. (Tr. 315). She was very close to stable at this time, but had a current GAF of 50. *Id*.[6]

On March 17, 2011, non-examining agency psychologist, Michelle Yetman-Katz, Ph.D., reviewed the record and opined that Osborne's affective disorders caused *mild* restriction of activities of daily living, *moderate* difficulties in maintaining social functioning, and *moderate* difficulties in maintaining concentration, persistence or pace. (Tr. 298). In addition, she found that Osborne was *markedly limited* in her ability to: (1) understand, remember, and carry out detailed instructions; (2) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (3) interact appropriately with the general public; (4) accept instructions and respond appropriately to criticism from supervisors; (5) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (6) respond appropriately to changes in the work setting. (Tr.300-302). Yetman-Katz further opined that Osborne was *moderately limited* in her ability to perform activities within a schedule, maintain regular attendance, and to be punctual within customary tolerances and sustain an ordinary routine without special supervision; and to work in coordination with or proximity to others without being distracted by them. (Tr. 301).

In support of her findings, Dr. Yetman-Katz noted that Osborne was living in a shelter

---

[6] A GAF of 41-50 denotes "**[s]erious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting ) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)." *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition DSM-IV, p. 32 (emphasis in original).

and was receiving intensive mental health services. (Tr. 73). Yetman-Katz further opined that Osborne's reports of limitations were consistent with file evidence, and thus she appeared credible. *Id*. She concluded that because of Osborne's severe, chronic mental illness, Osborne would require an unreasonable length or number of rest periods during a standard day. *Id*.

      b)    <u>Discussion</u>

In her decision, the ALJ reviewed the available evidence, including the hearing testimony, plaintiff's activities of daily living, the impressions of plaintiff's treating psychiatrist, the examination report of the consultative psychologist, and the assessment of the non-examining agency psychologist. (Tr. 22-23). In deriving plaintiff's RFC, the ALJ resolved the opinion evidence as follows,

> [a]s for the opinion evidence, consultative psychologist, Dr. Williams, opines that the claimant's concentration, pace, and persistence is adequate. State agency physician [sic], Michelle Yetman-Katz, Ph.D. opined that the claimant should be able to remember locations and work procedures. She should also be able to remember short and simple instructions but would have trouble with complex instructions. Both opinions are afforded great weight because they are consistent with record [sic] as a whole.
>
> A psychiatrist (illegible signature) at Monroe Mental Health opined that the claimant is sufficiently disabled to a degree that future gainful employment is unlikely. However this opinion is given little weight because it is not consistent with the record as a whole. Moreover, a determination of disability is reserved for the Commissioner.

(Tr. 23).

Plaintiff contends that the ALJ erred because despite purporting to afford "great weight" to Dr. Yetman-Katz's opinion, she effectively rejected, without discussion, several limitations assigned by Dr. Yetman-Katz. Indeed, under the regulations, the ALJ must consider the findings and opinions of the state agency medical and psychological consultants. 20 C.F.R. § 404.1527(e)(2)(i). Also, "[u]nless a treating source's opinion is given controlling weight, the

administrative law judge must explain in the decision the weight given to the opinions of a State agency medical . . . psychologist . . . as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources . . ." 20 C.F.R. § 404.1527(e)(2)(ii). Moreover, although "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion,"[7] the ALJ cannot reject a medical opinion without an explanation supported by good cause. *See Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir.2000) (citations omitted).

      Here, the ALJ provided no reason for effectively rejecting Dr. Yetman-Katz's additional limitations. The Commissioner contends that this omission is harmless because Dr. Williams' relatively benign report provides substantial support for the ALJ's RFC. The court would be more willing to endorse this argument had Dr. Williams quantified his findings via a medical source statement that addressed each of the activities of mental functioning. Instead, it was Dr. Yetman-Katz who reviewed Dr. Williams' report, as well as the impressions of the treating psychiatrist, Dr. Zentner, and then translated them into a mental RFC. Moreover, the ALJ did not completely reject Dr. Yetman-Katz's report; rather, she selectively adopted part of her findings, and then failed to explain why she excluded the remainder. The ALJ, however, is not permitted to simply "pick and choose" only the evidence that supports her decision. *Loza, supra*.

      The court also observes that Dr. Yetman-Katz's findings were influenced in no small part by Dr. Zentner's placement of Osborne in a sheltered living facility, which did not occur until September-October 2010 when her condition deteriorated. However, Dr. Williams examined Osborne in August 2010 – *prior* to the exacerbation of symptoms, and arguably, prior to the

---

    [7] *Martinez v. Chater*, 64 F.3d 172, 175-76 (5th Cir.1995) (citation and internal quotation marks omitted).

relevant period at issue in this case.  *See* fn 1, *supra*.

On the other hand, Osborne left the sheltered housing facility in March 2011.  She also reported around that time that she was doing better with her new medication.  Moreover, there is no indication that Dr. Yetman-Katz was aware of these subsequent developments, which, together, suggest that the increased severity of Osborne's mental impairments was transitory – perhaps lasting only up to five months.  The difficulty is that the record does not contain an assessment of the effects of Osborne's impairments after she returned to her baseline in March 2011.  Although Monroe Mental Health documented that Osborne was "very close to stable" at the time that she left the shelter, it nonetheless assigned her a GAF score of 50

The court further observes that plaintiff supplemented the record before the Appeals Council with an attorney-supplied medical statement form concerning schizophrenia that her treating psychiatrist, Dr. Zentner, completed on February 2, 2012.  (Tr. 325-326).  Zentner indicated, *inter alia*, that Osborne was markedly limited in her ability:  1) to understand and remember detailed instructions; 2)  to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without unreasonable number and lengths of breaks; and 3) to interact appropriately with the general public.  *Id*.  He further recognized that a number of other functions were moderately limited.  *Id*.

The foregoing evidence constitutes part of the instant record – provided that it is new, material and related to the period before the ALJ's decision.  *See Higginbotham v. Barnhart*  405 F.3d 332 (5th Cir. 2005); 20 C.F.R. § 404.970(b).[8]  There is little question that the additional

---

[8]   *Higginbotham* cited *Perez v. Chater*, and *Wilkins v. Sec'y Dept. of Health Human Servs.* as support for its finding that post-ALJ evidence is to be considered part of the record. *See, Higginbotham*, 405 F.3d at fn. 3 (*citing inter alia*,  *Perez v. Chater*, 77 F.3d 41, 44–45 (2d Cir.1996) and *Wilkins v. Sec'y, Dept. of Health Human Servs*., 953 F.2d 93, 96 (4th Cir.1991) (*en banc*)).  Both *Perez* and *Wilkins* require that the subsequent evidence be new, material and

evidence meets the applicable criteria. The medical source statement is certainly new; the record before the ALJ does not contain a medical source statement by Dr. Zentner. Moreover, it is related to the relevant period because Dr. Zentner stated as much. Finally, the evidence is material because the ALJ rejected Dr. Zentner's statement that Osborne was disabled, at least in part, on the basis that it was conclusory, i.e. that it addressed an issue reserved to the Commissioner. The medical source statement redresses this rationale for rejecting Dr. Zentner's impressions.[9]

In accordance with its now usual practice, the Appeals Council declined to provide any reason for discounting the efficacy of the new evidence adduced by Osborne. *See* Tr. 1-2. Accordingly, the Commissioner, in her memorandum, proffers several theories that could have supported the Appeals Council's determination. *See* Gov.'t Brief, pgs. 8-10. In other appropriate cases (i.e., where the Commissioner's decision otherwise is supported by substantial evidence and remains free of legal error), this court has not shied away from providing requisite filler to support gaps in the ALJ's decision. This case, however, is not so disposed.

In sum, the ALJ purported to ground her decision on the findings of Drs. Williams and Yetman-Katz. However, Dr. Williams examined Osborne apparently before the relevant period, and before a subsequent deterioration in Osborne's condition. In addition, Williams did not quantify the effects of Osborne's impairments via medical source statement. The sole mental health provider who *did* complete a medical source statement, at least prior to the time of the

---

relevant to the pre-ALJ decisional period. *Perez, supra*; *Wilkins, supra* (citing, 20 C.F.R. § 404.970(b)).

[9] Although the ALJ further rejected Dr. Zentner's findings because they were "not consistent with the record as whole [sic]," she failed to provide any details of the alleged inconsistencies.

ALJ's decision, was Dr. Yetman-Katz.  However, the ALJ omitted, without explication, several limitations of functioning endorsed by Dr. Yetman-Katz.  The ALJ further rejected, as conclusory, the impression of Osborne's treating psychiatrist, Dr. Zentner.  Nevertheless, plaintiff remedied this shortcoming by providing a medical source statement to the Appeals Council.

Accordingly, the undersigned is compelled to find that the instant record does not contain substantial evidence to support the ALJ's residual functional capacity assessment.

**II.      Step Five and Remand**

Because the foundation for the ALJ's step five determination was premised upon an RFC that is not supported by substantial evidence, the court further finds that the Commissioner's ultimate conclusion that plaintiff is not disabled also is not supported by substantial evidence.

Plaintiff urges the court to enter a judgment awarding benefits for the relevant period.  The courts have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. §405(g).  When reversal is warranted, the matter is remanded with instructions to make an award only if the record enables the court to conclusively determine that the claimant is entitled to benefits.  *See Ferguson v. Heckler*, 750 F.2d 503, 505 (5th Cir. 1985); *see also Rini v. Harris*, 615 F.2d 625, 627 (5th Cir.1980) (reversing and remanding with direction to enter judgment where the evidence was not substantial and the record clearly showed the claimant's right to benefits).  The instant record is not so disposed.  Plaintiff's residual functional capacity assessment remains indeterminate.

## Conclusion

For the above-stated reasons,

IT IS RECOMMENDED that the Commissioner's decision be REVERSED and REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings consistent herewith.[10]

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 13th day of March 2014.

_/s/ Karen L. Hayes_
KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE

---

[10] The court need not consider Plaintiff's additional arguments. These issues may be addressed upon remand.